# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 17-0073V
Filed: August 7, 2019
UNPUBLISHED

| | |
|---|---|
| DEBORAH KENT,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Christine Mary Becer, U.S. Department of Justice, Washington, DC, for respondent*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

　　On January 17, 2017, Deborah Kent ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act" or "Program") for injuries, including left shoulder adhesive capsulitis and a supraspinatus tendon tear, caused in fact by the influenza vaccination she received on October 2, 2015.  Petition at 1, ¶¶ 2, 14 (ECF No. 1).

　　For the reasons described below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$82,564.78, representing compensation in**

---

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**the amount of $80,000.00 for actual pain and suffering and $2,564.78 to satisfy her Medicaid lien.**

I. **Relevant Procedural History**[3]

By early June 2017, petitioner finished filing her medical records in this case. *See* Exhibits 12-13 (ECF No. 13). On July 7, 2017, respondent filed a status report indicating that he was interested in pursuing a litigative risk settlement. (ECF No. 14). Over the subsequent four months, the parties engaged in settlement discussions. *See* Status Reports, filed Aug. 21 and Oct. 6, 2017 (ECF Nos. 16, 19). On November 9, 2017, petitioner filed a status report indicating the parties had reached an impasse in their settlement discussions. (ECF No. 21). Respondent filed his Rule 4 report on December 27, 2017. (ECF 23).

A fact hearing regarding the onset of petitioner's pain was held in Grand Rapids, Michigan on June 26, 2018. After allowing the parties the opportunity to supplement the record, the undersigned issued a ruling, finding petitioner entitled to compensation. Ruling on Entitlement, filed Feb. 12, 2019 (ECF No. 33). The parties were instructed to engage in informal damages discussions to determine if they could agree upon an appropriate amount of compensation in this case. Damages Order, issued Feb. 14, 2019 (ECF No. 34). On April 2, 2019, petitioner's counsel emailed the OSM staff attorney managing this SPU case, informing her that the parties had reached an impasse in their damages discussions and requesting that a schedule for briefing be set.[4]

By early June 2019, both parties had filed their damages briefs. *See* Respondent's Brief on Damages ("Res. Brief"), filed May 29, 2019 (ECF No. 38); Petitioner's Brief in Support of Damages ("Pet. Brief"), filed June 3, 2019 (ECF No. 39). Neither filed a response to the opposing party's brief.

II. **Relevant Medical History**

During most of 2014, petitioner received her primary medical care from the Hart Family Medicine Center ("the Hart Center"), part of the Mercy Health Physician Partners. Exhibit 2 at 53-88. From late 2014 through mid-July 2015, petitioner was seen on several occasions at Pentwater Family Medicine (Exhibit 4 at 7-56, 64-71). The medical records from these providers indicate that prior to vaccination, petitioner suffered occasional vertigo, routine illnesses, and common conditions. There is no mention of any shoulder issues in these records.

On October 2, 2015, petitioner transferred back to the Hart Center (referred to hereinafter as petitioner's primary care provider ("PCP")). Exhibit 2 at 92. At this visit for a comprehensive physical, she received the vaccination alleged as causal. *Id.* at 90-

---

[3] The undersigned adopts the comprehensive procedural history set forth in her Findings of Fact and Ruling on Entitlement filed in February 2019. *See Kent v. Sec'y of Health & Human Servs.,* No. 17-0073V, 2019 WL 1556824, at *1-4 (Fed. Cl. Spec. Mstr. Feb. 12, 2019).

[4] Respondent's counsel was copied on all correspondence.

95. The vaccination was administered intramuscularly in petitioner's left upper arm. Exhibit 1; Exhibit 2 at 95.

A few days after vaccination, on October 5, 2015, petitioner followed up by telephone regarding the insurance coverage for the calcium supplement she was taking. Exhibit 2 at 94 (indicating follow-up would occur), 96 (telephone call from petitioner indicating the supplement would be covered). On October 6, 2015, she visited the lab to have blood drawn for testing. *Id.* at 97-98. Petitioner faxed her completed Health Risk Assessment on October 12, 2015. *Id.* at 99-103.

On December 1, 2015, petitioner called her PCP regarding a referral to get her hearing checked. Exhibit 2 at 104. She was seen on December 7, 2015, and referred to ear, nose, and throat. *Id.* at 105-07. There is no mention of shoulder pain at this visit, and under the musculoskeletal portion of the physical examination section, it is noted only that petitioner's gait was normal.[5] *Id.* at 106.

Approximately three months after vaccination, on January 4, 2016, petitioner was seen by her PCP, complaining of left upper arm pain which began when she received the influenza vaccination. Exhibit 12 at 1. She indicated her "arm pain began started when she got the shot, . . . [and] [s]he tried to just give it time to get better." *Id.* Describing her pain as achy, like a toothache, she questioned whether the nurse had hit a bone during administration or the needle could be stuck in her arm. *Id.* Upon examination, Jennifer Tate, PA,[6] observed limited range of motion ("ROM") and tenderness below the deltoid, but no shoulder swelling or tenderness. Exhibit 12 at 2. Petitioner was sent for x-rays, performed the next day, which showed no fracture or other abnormality. *Id.* at 2-3.

On January 11, 2016, petitioner called her PCP for the results of her x-rays. Exhibit 2 at 110. After being informed they were normal, petitioner was referred to orthopedics and an MRI was ordered.[7] *Id.* at 110-11. Conducted on January 14, 2016, the MRI showed "[p]rominent tendinosis in her supraspinatus and infraspinatus tendons" and "a small full-thickness tear in the lateral supraspinatus tendon." Exhibit 3 at 1. In light of these findings, petitioner's PCP worked diligently from January 18 through 25, to obtain an orthopedic appointment earlier than the one initially scheduled for August

---

[5] This notation is found throughout the medical records from petitioner's PCP, usually accompanied by an additional notation that petitioner's digits/nails did not show "clubbing, cyanosis, inflammation, or ischemia." *E.g.,* Exhibit 2 at 70, 94. In this case, only the notation regarding petitioner's gait was included. *Id.* at 106.

[6] When petitioner visited her PCP, she was usually treated by Ms. Tate, who is a physician's assistant. *E.g.,* Exhibit 2 at 92 (listing Jennifer Tate as petitioner's provider).

[7] These two options were initially presented to petitioner as alternatives, with petitioner choosing a referral to orthopedics. Exhibit 2 at 110. When petitioner was unable to get an appointment until August 2016, an MRI was ordered. *Id.* at 111.

3

2016.[8]  Exhibit 2 at 111-12.  On January 25, 2016, an appointment was procured with a different orthopedist for the end of February 2016.  *Id.*

During this time, on January 20, 2016, petitioner visited her PCP for a rash which began approximately two months earlier.  Exhibit 2 at 113.  Petitioner attributed the rash to nerves, and a topical cream was prescribed.  *Id.* at 114.  In the record from this visit, it was noted that petitioner was in no acute distress.  *Id.* at 113.  Under the musculoskeletal portion of the physical examination, it was reported only that petitioner's gait was normal.  *Id.* at 114.

Petitioner was seen by Randolph Grierson, DO,[9] for left shoulder pain on February 29, 2016.  Exhibit 11 at 2-11; *see also* Exhibit 2 at 18-21 (copy of record sent from Dr. Grierson to Jennifer Tate, PA).  At this visit, petitioner reported that her left shoulder pain began in October after receiving an influenza vaccination.  She further reported that the injection was painful and that she had no left shoulder pain or weakness prior to the injection.  Describing her pain as aching, she rated its severity as an eight out of ten.  Exhibit 11 at 8.  When examining petitioner, Dr. Grierson observed "profoundly limited active and passive motion of the left shoulder with pain."  *Id.* at 10.  After reviewing petitioner's MRI, Dr. Grierson expressed his belief that "the painful injection did not cause the rotator cuff tear [which] was present before the injection."  *Id.* at 11.  Regarding the cause of petitioner's pain, Dr. Grierson concluded it "comes from an adhesive capsulitis" and indicated that her pain should subside with formal physical therapy ("PT").  *Id.*  He added that other treatments, such as injections, manipulation under anesthesia, and surgery, could be considered if PT was unsuccessful.  *Id.*

On March 8, 2016, petitioner began formal PT at Lakeside Comprehensive Rehabilitation ("Lakeshore Rehab").  Exhibit 8 at 1-4 (initial evaluation).  During examination, "[s]evere pain [was] noted with all shoulder ROM."  *Id.* at 2.  Petitioner's left deltoid pain was described as "consistent with supraspinatus pain referral pattern." *Id.*  Petitioner reported difficulty when lifting, sleeping, and performing overhead and recreational activities.  *Id.* at 3.  Petitioner was assessed as "motivated with good potential to reach goals," but it was noted that she would be moving to another area of Michigan in three weeks.  *Id.*

Petitioner attended seven PT sessions at Lakeshore Rehab from March 9 through 28.  Exhibit 8 at 5-18 (in reverse order).  During this time, her pain improved from a level of three out of ten prior to PT and ten out of ten after PT to a prior level of one out of ten and post-level of six out of ten.  *Compare id.* at 15 *with id.* at 5.  She reported that her stretching was becoming easier (*id.* at 11) and that she was able to dress with greater ease (*id.* at 7).  At her last session, on March 28, 2016, it was reported that petitioner's PT would be suspended while she was out of town.  *Id.* at 5.

---

[8] Because Petitioner was a Medicaid recipient, her PCP encountered difficulty getting her an orthopedic appointment in Kent county.  Exhibit 2 at 112.

[9] Dr. Grierson is an orthopedic surgeon in Ludington, Michigan.  *See* https://www.healthgrades.com/physician/dr-randolph-grierson-2frqm (last visited on Dec. 27, 2018).  In a later record, he is described as an orthopedic surgeon.  Exhibit 10 at 5.

4

During February and March 2016, petitioner was seen at her PCP on three occasions, complaining of dry eyes, a rash, vaginitis, cough, and sore throat. *See* Exhibit 2 at 22-33. In the records from these visits under the reviewed problems section, it is noted that petitioner suffered from a "[d]isorder of bone and cartilage" with onset listed as October 2, 2015. *Id.* at 22, 25, 28. Presumably, this entry is referencing petitioner left shoulder condition. There is no further mention of petitioner's left shoulder pain, and the section titled review of systems (ROS) does not include a subsection for the musculoskeletal system. *Id.* at 23-24, 27, 30-31. There is no complaint of left shoulder pain in the medical records from any of these visits.

After petitioner moved closer to Grand Rapids, she resumed PT at a new facility, Northern Physical Therapy Services ("Northern PT"). Exhibit 6. Her initial evaluation indicated she was referred by Jennifer Tate, PA. *Id.* at 53. At this first visit, on April 14, 2016, petitioner described her left shoulder pain as a "sharp pain, after flu shot, [which] never went away," rating its severity as between four and seven. *Id.* She shared the results of her x-rays and MRI and indicated "Dr. Greer[10] called it frozen shoulder d/t disuse." *Id.* The physical therapist who evaluated petitioner, Erin Willett, DPT,[11] assessed petitioner's tolerance during evaluation and rehabilitation potential as good. *Id.* at 57. She recommended twice weekly sessions for six weeks. *Id.*

From April 14 through June 9, 2016, petitioner attended 16 PT sessions at Northern PT. At her last session on June 9, 2016, she rated her level of pain as three out of ten and described her pain as intermittent, occurring primarily when she reached behind her back or out to the side. Exhibit 6 at 3. At her June 7, 2016 session, petitioner reported she would be seeing an orthopedist specialist, Dr. Howard, the following week. *Id.* at 8. Petitioner was discharged from PT on July 19, 2016. *Id.* at 1. Noting that petitioner's last visit was on June 9, 2016, the record indicates staff spoke to petitioner "who stated she no longer needs PT." *Id.* The record further indicates petitioner met approximately one-third of her goals (four out of twelve). *Id.* at 1-2.

On May 12, 2016, petitioner visited Grand Valley Health Plan for a health assessment. Exhibit 7 at 16-20. In this record, it is noted that petitioner experienced a left rotator cuff tear in October 2015, for which she is undergoing PT. *Id.* at 16. It appears that petitioner had switched to this clinic for her primary care, as she was also seen in June 2016 for a headache (*id.* at 12-15), in July 2016 for a spider bite (*id.* at 7-11), and in September 2016 for a skin lesion (*id.* at 4-6).

On June 14, 2016, petitioner was seen at a new PT facility, Spectrum Health Rehab. Exhibit 9 at 11-12, 16-17 (questionnaire completed by petitioner); 25-27 (record from visit). It was noted that petitioner's pain, rated at a level of three to seven on a scale of ten, limited her activities such as sleeping, lifting, grooming, dressing, and performing yardwork. *Id.* She was observed to have "reduced shoulder ROM, strength and posture deficits as might be expected with adhesive capsulitis." *Id.* at 26. Petitioner reported that she previously had attended PT and had made good progress.

---

[10] Presumably, Dr. Greer is meant to be Dr. Grierson.

[11] DPT stands for Doctorate of Physical Therapy.

*Id.* at 25-26.  She expressed a desire to be able to lift her grandson and to use her arm normally.  *Id.* at 26.  It was noted that she should benefit from additional PT, and twice weekly sessions for four to six weeks were recommended.  *Id.* at 26-27.

It appears petitioner's first visit to Dr. Howard, the orthopedist mentioned during an earlier PT session, occurred on June 22, 2016.  Exhibit 10 at 2-29.  At that visit, petitioner reported that her shoulder pain occurred suddenly and was related to her influenza vaccination.  *Id.* at 5.  She described her pain as located in the lateral upper arm, mild and stabbing, and "aggravated by flexing or extending the shoulder, lifting, lying on the affected side, and overhead activity."  *Id.*  Petitioner indicated that she had undergone an MRI, been evaluated by an orthopedic surgeon and her PCP, and participated in 26 sessions of PT.  *Id.* at 5-6.  An evaluation of petitioner's shoulder revealed tenderness, limited ROM, and normal strength.  *Id.* at 7.  Petitioner shared her belief that "her shoulder [wa]s gradually improving over the last six months because of the consistent physical therapy she had been receiving" and expressed her lack of interest in a cortisone injection or surgery.  *Id.* at 8.  Dr. Howard cautioned that it often takes a long time to recover from adhesive capsulitis.  He ordered additional PT.  *Id.*

Between June 14 and August 4, 2016, petitioner attended 9 PT sessions at Spectrum Health Rehab.  *See* Exhibit 9 at 56.  On August 4, 2016, she indicated her level of pain had decreased, rating the severity between zero and seven.  She added that she was able to do more, but continued to have difficulty reaching overhead, especially when lifting heavier objects, and behind her back.  *Id.*  Petitioner was assessed as showing improvement in her ROM, strength, and ability to perform certain activities.  *Id.* at 57.  It was noted that petitioner had improved her ROM by between 10 to 15 degrees (*id.* at 58), but some limitation was still observed (*id.* at 57, ranking ROM at four out of five).  Petitioner had partially met her goal of being able to lift her grandson to eye level without pain.  *Id.* at 58.

### III.  Testimony

During the fact hearing held in Grand Rapids, Michigan on June 26, 2018, the undersigned heard testimony from petitioner and her husband.  Petitioner testified first and described the details surrounding the vaccination alleged as causal, the subsequent treatment she received, and severity and effects of her injury.  Petitioner's husband provided testimony regarding his interactions with his wife following vaccination and limitations he observed.

Petitioner testified that she received the vaccination alleged as causal when visiting the Hart Clinic for a physical on October 2, 2015.  Transcript ("Tr.") at 5-7.  Petitioner recalled many of the details surrounding the vaccination, indicating that it occurred after the doctor left the room and was administered in her left arm while she was sitting with her top off and the nurse was standing. Tr. at 6-7.  Petitioner stated that, due to a fear of needles, she tried not to look while the vaccination was being administered but felt immediate pain upon injection, worse than what she had felt with previous vaccinations. Tr. at 7-8.  She asked the nurse if she broke the needle off in her arm.  Tr. at 7.  When petitioner's counsel asked petitioner if she had suffered from any prior shoulder injuries, petitioner replied that she had not. Tr. at 9-10.

6

Describing the events following vaccination, petitioner indicated she returned home and cried to her husband. Tr. at 10. In response, he gave her an ice pack and told her that the nurse may have bruised her bone. In addition to the ice pack, petitioner took Tylenol and tried heat to see if that would alleviate her pain. She stated that she slept in the recliner that night. When asked to describe the injection site, petitioner testified that she did not notice any redness or swelling but did have tenderness which felt better when she pressed on it slightly. Tr. at 10. She added that "It hurt, but then again, it kind of felt better if [she] pressed on it." Tr. at 10. She continued to apply ice and heat throughout the next day, only going to the store with her husband when he cautioned that she did not want her shoulder to become stiff. Tr. at 10-11.

Petitioner testified that, when she returned to the laboratory at her doctor's office to have blood drawn, she informed the technician of her left arm pain and was told that a man who was seen before her had a similar complaint. Tr. at 11-12. After examining her arm, the technician assured her that some people take longer to heal after a vaccination and that she should continue to apply ice and heat and to take Tylenol. Petitioner testified that she complained of her pain again when she called the clinic a few days later to obtain her cholesterol results. Tr. at 12. After being reassured that some people take longer to heal and being asked if she was experiencing a fever, petitioner declined to make an appointment. Tr. at 12-13.

Petitioner described the pain she experienced as a deep, burning pain which was exacerbated by movement. Tr. at 13. She indicated that eventually, her arm became frozen to her side, as if hanging in a sling. Tr. at 14. She testified that she was unable to shampoo her hair, apply deodorant, or sleep on her left, injured side. Tr. at 131-15. Because her vertigo prevented her from sleeping on her right side, petitioner reported that she "had to sleep sitting up." Tr. at 13. She recalled her husband having to do everything for her during this time, including packing for a trip to their daughter's house at Thanksgiving. Tr. at 15.

Petitioner then discussed her visit to her PCP in January 2016 and an orthopedist she saw in February. Tr. at 17. She indicated her PCP discussed different treatment options, including a cortisone injection, ordered x-rays and MRI, and referred her to an orthopedic surgeon after the MRI revealed some tears in her tendon. Tr. at 17-18. When later asked by respondent's counsel, why she declined a cortisone shot, petitioner expressed her dislike for doctors, needles, and surgery. Tr. at 28. Although she could not recall the name of the orthopedist, she remembered that he prescribed medication, including muscle relaxers which made her sick, gave her exercises to perform, and arranged formal PT. Tr. at 18.

Petitioner described her level of pain as ten out of ten when she began PT on March 8, 2016. Tr. at 20. She reported that her pain increased when the physical therapist began examining her, asking her to move her arm. Tr. at 20-21. She confirmed that the exercises she performed during PT and at home helped, but that "it took a lot of time" to obtain the mobility she sought. Tr. at 21-22.

7

Petitioner testified further regarding the activities she was unable to do during this time, such as lifting her iron skillet, knitting, or holding her grandson, and ways she had adapted to her limitations, such as using a stool when getting items from the cabinet. Tr. at 25-28. When questioned by petitioner's counsel regarding information provided in the medical record from a June 23, 2016 PT session, petitioner confirmed that she was unable to lift her grandson from the floor or his bed at that time. Tr. at 24-25.

Regarding her current condition, petitioner reported that her level of pain was one and one-half to two on a scale of ten. Tr. at 26. She described some limitations in her movements, adding that her pain was "not enough for [her] to want surgery." Tr. at 26. When respondent's counsel asked about specific activities: lifting her iron skillet, washing her hair, and putting on her bra, petitioner stated she could do all activities with an adjustment needed when lifting the iron skillet. Tr. at 40.

During his testimony, petitioner's husband confirmed that petitioner had complained of her shoulder pain shortly after vaccination and that he was required to help her with many of her normal activities. Tr. at 57-63. He testified that petitioner experienced pain the evening after vaccination and was unable to sleep. Tr. at 58. He did not recall the events of the next day but verified that he recommended petitioner seek medical care. Tr. at 60. When asked about petitioner's current condition, he indicated she was doing well. He stated that he still helps petitioner put away dishes that are kept in a higher location but attributed that in part to her short stature. Tr. at 63. He testified that he knew of no shoulder injury experienced by petitioner prior to the vaccination alleged as causal. Tr. at 64.

### IV.     The Parties' Arguments

Petitioner seeks damages in the amount of $90,000.00 for her actual pain and suffering and $2,564.78 to satisfy her Medicaid lien. Pet. Brief at 1 (ECF No. 39). In support of the amount sought for her past pain and suffering, petitioner stresses the severity of her tendinosis as shown on the January 14, 2016 MRI, the pain she suffered and the limitations in both active and passive movement which she experienced. Pet. Brief at 2-3. She maintains that she experienced "a severe left shoulder injury which greatly impacted her quality of life as well as her activities of daily living for a duration of at least ten (10) months." Pet. Brief at 5.

Referencing her testimony at the June 26, 2018 fact hearing, petitioner asserts that at least 18 months after vaccination, she continued to suffer pain at a level of one to two out of ten. Pet. Brief at 5; *see* Tr. at 26. Petitioner maintains that her injury limited her hobbies such as cooking and knitting and impacted her relationship with her grandson. Pet. Brief at 5.

Petitioner compares her injury to that suffered by the petitioners in *Kim, Desrosier,* and *Bruegging.*[12] Pet. Brief at 5. She argues that her case is most like that

---

[12] *Bruegging v. Sec'y of Health & Human Servs.,* No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Kim v. Sec'y of Health & Human Servs.*, No. 17-0418V, 2018 WL 3991022

8

of the petitioner in *Bruegging*, who was awarded $90,000.00 for his actual pain and suffering. Pet. Brief at 5-6. She maintains that her pain and suffering award should be greater than what was awarded in both *Kim* and *Desrosier,* because the duration of her injury and treatment was longer. While acknowledging that her case involves gaps in treatment, like the one exhibited by the petitioner in *Kim,* petitioner insists that her pain was more severe and that her MRI showed a more significant injury than that suffered by the petitioner in *Kim.* Pet. Brief at 7. Regarding *Desrosier,* petitioner cites to a report that the *Desrosier* petitioner exhibited no tenderness and showed full ROM. Pet. Brief at 6.

Respondent argues that petitioner should be awarded $57,500.00 as compensation for her actual pain and suffering. Res. Brief at 1 (ECF No. 38). He indicates he has no objection to the $2,564.78 petitioner seeks to satisfy her Medicaid lien. Res. Brief at 13.

To justify this lower amount, respondent stresses the approximately three-month gap between vaccination and treatment shown in this case and the occasions when petitioner received treatment for other conditions and failed to mention her left shoulder pain. Res. Brief at 3. Adding that petitioner did not receive a cortisone injection or surgery, respondent argues these facts indicate petitioner's SIRVA was not severe. Res. Brief at 12. Moreover, respondent notes that petitioner has not needed treatment since June 2016. Res. Brief at 12.

Respondent compares petitioner's SIRVA to those suffered by petitioners in *Marino, Kim, and Knauss.*[13] Res. Brief at 12-13. He argues that the facts in this case are most like those in *Knauss. Id.* at 13.

### V.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined

---

(Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Desrosiers v. Sec'y of Health & Human Servs.*, No. 16-0224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

[13] *Marino v. Sec'y of Health & Human Servs.*, No. 16-0622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Knauss v. Sec'y of Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Kim*, 2018 WL 3991022 (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses).

to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, the undersigned may also rely on her own experience adjudicating similar claims.[14] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

---

[14] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

10

## VI.   Prior SIRVA Compensation

### A.  History of SIRVA Settlement and Proffer[15]

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2019, 1,187 SIRVA cases have informally resolved[16] within the Special Processing Unit since its inception in July of 2014. Of those cases, 706 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[17] Additionally, 462 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,325.00 to $123,116.00.[18] The median award is $95,470.95. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $95,000.00.[19] The median award is $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

---

[15] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims website by keyword and/or by special master. On the court's main page, click on "Opinions/Orders" to access the database. All figures included in this order are derived from a review of the decisions awarding damages within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[16] Additionally, 36 claims alleging SIRVA have been dismissed within the SPU.

[17] Additionally, there have been 19 prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

[18] Typical range refers to cases between the first and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Among the 19 SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00 with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $160,502.39.

[19] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

### B. Prior Decisions Addressing SIRVA Damages

In addition to the extensive history of informal resolution, the undersigned has also issued 19 reasoned decisions as of the end of May of 2019 addressing the appropriate amount of compensation in prior SIRVA cases within the SPU.[20]

#### i. Below-median awards limited to past pain and suffering

In eleven prior SPU cases, the undersigned has awarded compensation for pain and suffering limited to compensation for actual or past pain and suffering that has fallen below the amount of the median proffer discussed above. These awards ranged from $60,000.00 to $91,163.89.[21] These cases have all included injuries with a "good" prognosis, albeit in some instances with some residual pain. All of these cases had only mild to moderate limitations in range of motion and MRI imaging likewise showed only evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. The duration of injury ranged from six to 29 months and, on average, these petitioners experienced approximately 14 months of pain.

Significant pain was reported in these cases for up to eight months. However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale. Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less. Approximately one-half were administered one to two cortisone injections. Most of these petitioners pursued physical therapy for two months or less and none had any surgery. The petitioners in *Weber* and *Garrett* attended PT for five and four months respectively, but

---

[20] An additional case, *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, cited by petitioner, was removed from the SPU due to the protracted nature of the damages phase of that case. In that case the undersigned awarded $100,000.00 in compensation for past pain and suffering and $2,293.15 for past unreimbursable expenses. *Young,* 2019 WL 664495 (Fed. Cl. Spec. Mstr. Jan. 22, 2019). A separate reasoned ruling addressed the amount awarded. *Young,* 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019).

[21] These cases are: *Bruegging*, 2019 WL 2620957 (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); *Pruett v. Sec'y of Health & Human Servs.*, No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); *Bordelon v. Sec'y of Health & Human Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); *Garrett v. Sec'y of Health & Human Servs.*, No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); *Attig v. Sec'y of Health & Human Servs.,* No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); *Dirksen v. Sec'y of Health & Human Servs*., No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); *Kim,* 2018 WL 3991022 (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); *Knauss,* 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Marino,* 2018 WL 2224736 (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Desrosiers,* 2017 WL 5507804 (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

12

most of the PT in *Weber* was focused on conditions unrelated to his SIRVA. Several of these cases (*Knauss*, *Marino*, *Kim*, and *Dirksen*) included a delay in seeking treatment. These delays ranged from about 42 days in *Kim* to over six months in *Marino*.

### ii. Above-median awards limited to past pain and suffering

Additionally, in five prior SPU cases, the undersigned has awarded compensation limited to past pain and suffering falling above the median proffered SIRVA award. These awards have ranged from $110,000.00 to $160,000.00.[22] Like those in the preceding group, prognosis was "good." However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or by the need for surgical repair. Four out of five underwent some form of shoulder surgery while the fifth (*Cooper*) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment. On the whole, MRI imaging in these cases also showed more significant findings. In four out of five cases, MRI imaging showed possible evidence of partial tearing.[23] No MRI study was performed in the *Cooper* case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion. Moreover, these petitioners tended to seek treatment of their injuries more immediately. Time to first treatment ranged from five days to 43 days. Duration of physical therapy ranged from one to 24 months and three out of the five had cortisone injections.

---

[22] These cases are: *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); *Dobbins v. Sec'y of Health & Human Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); *Collado v. Sec'y of Health & Human Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

[23] In *Reed*, MRI showed edema in the infraspintaus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head. In *Dobbins*, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies. In *Collado*, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus. In *Knudson*, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.

### iii. Awards including compensation for both past and future pain and suffering

In three prior SPU SIRVA cases, the undersigned has awarded compensation for both past and future pain and suffering.[24] In two of those cases (*Hooper* and *Binette*), petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain. The *Hooper* petitioner underwent surgery while in *Binette* petitioner was deemed not a candidate for surgery following an arthrogram. Despite significant physical therapy (and surgery in *Hooper*), medical opinion indicated that their disability would be permanent. In these two cases, petitioners were awarded above-median awards for actual pain and suffering as well as awards for projected pain and suffering for the duration of their life expectancies. In the third case (*Dhanoa*), petitioner's injury was less severe than in *Hooper* or *Binette*; however, petitioner had been actively treating just prior to the case becoming ripe for decision and her medical records reflected that she was still symptomatic despite a good prognosis. The undersigned awarded an amount below-median for actual pain and suffering, but, in light of the facts and circumstances of the case, also awarded projected pain and suffering.

## VII. Appropriate Compensation in this SIRVA Case

In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

### A. Severity and Duration of Petitioner's SIRVA

The medical records in this case establish that petitioner suffered a SIRVA injury with significant levels of pain, prominent tendinosis, and profoundly limited ROM for approximately six months after vaccination. Ten months after vaccination, petitioner continued to experience reduced levels of pain and limitations in ROM but no longer required medical care.

When petitioner first sought medical care in early January 2016, she described her pain as an achy toothache and was observed to exhibit limited ROM. Exhibit 12 at 1. She indicated she had experienced pain upon vaccination but had given the issue time to resolve on its own. *Id.* At the fact hearing, petitioner testified that she mentioned her shoulder pain during a visit to the laboratory a few days later and, thereafter, during a telephone conversation with an individual who petitioner assumed was Dana, a nurse, at her PCP provider's office. Tr. at 11. Petitioner maintains, during

---

[24] These cases are: *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); and *Hooper v. Sec'y of Health & Human Servs.*, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering, $37,921.48 for lost wages).

both conversations, she was told that it takes time for pain from a vaccination to resolve. Tr. at 11-12. Regarding the telephone conversation, she added that she was told she did not require an appointment and that it sometimes takes a few weeks for any vaccination related pain to resolve. Tr. at 12-13. By the time petitioner saw an orthopedist in late February 2016, she rated the severity of her pain as eight out of ten. Exhibit 11 at 8. The orthopedist, Dr. Grierson, described petitioner's ROM as profoundly limited and assessed her as having adhesive capsulitis. *Id.* at 10-11.

Given the evidence establishing petitioner had a sincere belief that the vaccination needle may have broken off in her shoulder, petitioner's claim that she declined cortisone injections due to her fear of needles is credible. Tr. at 18. On at least one occasions, the medical records reflect petitioner's aversion to this procedure. Exhibit 10 at 8. Similarly, the undersigned credits petitioner's assertion that she was unable to take the muscle relaxers prescribed to her because they made her feel nauseated. Tr. at 28.

Relying on PT alone, petitioner obtained slow relief from the sessions she attended. When seen by Dr. Grierson on February 29, 2016, almost five months after vaccination, petitioner reported aching pain at a level of eight out of ten. Exhibit 11 at 8. Noting that petitioner exhibited a profoundly limited ROM for both passive and active movement, Dr. Grierson determined petitioner's pain came from adhesive capsulitis. *Id.* At petitioner's first PT session, she reported consistent pain which was severe with all movement. Exhibit 8 at 2. By her seventh and last PT session at that facility in late March 2016, approximately six months after vaccination, petitioner reported reduced levels of pain: one out of ten prior to PT and six out of ten afterwards. *Id.* at 5. She also indicated that she experienced less difficulty when stretching and greater ease when dressing. *Id.*

After moving closer to Grand Rapids, Michigan, petitioner attended a total of 24 PT sessions at two different facilities from April through early August 2016. During this time, she described her condition as gradually improving. Exhibit 10 at 8 (record from June 22, 2016 visit to a new orthopedist, Dr. Howard). At her last PT session on August 4, 2016, petitioner rated her pain as between zero and seven. Exhibit 9 at 56. It was noted that petitioner's ROM had improved 10 to 15 degrees, but some limitation was observed. *Id.* at 57-58 (ROM was described as four out of five). Petitioner reported that she was able to do more but still experienced some difficulty reaching overhead, putting her arm behind her back, and moving heavy objects. *Id.* at 57.

Petitioner did not require further medical treatment. At the June 26, 2018 fact hearing, she testified that her current level of pain was one and one-half to two on a scale of ten, that she had only some limitations in her ROM, and that she could performed most activities without adjustment. Tr. at 26, 40.

There is preponderant evidence to establish petitioner suffered severe symptoms of her SIRVA, including significant pain, prominent tendinosis, and a substantially limited ROM, for approximately six months after vaccination. By the end of this period, she showed substantial improvement. After further PT and a visit to another orthopedist, petitioner's pain was reported to be zero to seven on a scale of ten.

15

Approximately ten months after vaccination, petitioner attended her last PT session. At that visit, she exhibited pain at a level of zero to seven on a scale of ten and exhibited some residual limitations in her ROM.

### B. Comparison to Other SIRVA Awards

The facts in petitioner's case are most similar to those found in *Kim,* but the duration of her initial, more severe pain; total length of time for her SIRVA; extent of her limited ROM; and severity of her tendinosis, as shown on petitioner's MRI, were all greater. The *Kim* petitioner did seek medical care sooner, 42 days after vaccination as opposed to almost three months in this case. However, the undersigned finds petitioner's testimony that she complained of her shoulder pain twice after vaccination and was reassured her recovery may take weeks to be credible. The undersigned finds that the petitioner in this case should be awarded more for her pain and suffering than the amount awarded in *Kim,* $75,000.00.

A review of the facts in other cases in which petitioners received $75,000.00 for pain and suffering supports this assessment.[25] The MRIs performed in those cases showed a more moderate injury than that suffered by the petitioner in this case.[26] Additionally, in this case, petitioner's movement was more limited, and she was diagnosed with adhesive capsulitis. In all but *Marino,* the duration of the initial, more severe pain, suffered by these other petitioners was shorter.[27] Although the petitioner in *Marino*, a nurse practitioner, suffered more severe pain for seven months as she attempted to self-treat, she assessed her pain at a level lower than reported by the petitioner in this case, five to six out of ten. *Marino*, 2018 WL 2224736, at *7-8. As evidence of her more moderate injury, the petitioner in *Marino* continued to play tennis during this time. *Id.* at *7.

Petitioner's pain and suffering appears to be less than that suffered by the petitioners in cases in which the undersigned awarded $85,000.00. In all but *Desrosier*,[28] the initial period of more severe pain experienced by these petitioners was at least eight months.[29] Although the initial pain levels of the petitioners in *Dhanoa* and

---

[25] *Pruett,* 2019 WL 3297083, at *10; *Bordelon*, 2019 WL 2385896, at *6; *Attig*, 2019 WL 1749405, at *8; *Marino*, 2018 WL 2224736, at *1, 9; *Kim*, 2018 WL 3991022, at *10.

[26] *Pruett,* 2019 WL 3297083, at *3; *Bordelon*, 2019 WL 2385896, at *8; *Attig*, 2019 WL 1749405, at *3; *Marino*, 2018 WL 2224736, at *2; *Kim*, 2018 WL 3991022, at *3.

[27] *Pruett,* 2019 WL 3297083, at *1-3; *Bordelon*, 2019 WL 2385896, at *7-8; *Attig*, 2019 WL 1749405, at *2-3; *Kim*, 2018 WL 3991022, at *1-3.

[28] The undersigned notes that the *Desrosiers* petitioner's shoulder injury occurred during the course of her pregnancy and continued to affect her following the birth of her son. 2017 WL 5507804, at *1-4. The *Desrosiers* petitioner was prevented from taking more effective prescription pain medication during her pregnancy and stated that her shoulder injury impacted her ability to perform "the most basic duties of a new mother," including nursing and comforting her infant son. *Id.* at *4.

[29] *Bruegging*, 2019 WL 2620957, at *1-3; *Weber*, 2019 WL 2521540, at *1-3; *Dirksen*, 2018 WL 6293201, at *2-5; *Dhanoa*, 2018 WL 1221922, at *3-5.

*Dirksen* were lower, the total durations of their SIRVAs were more than twice that of the petitioner in this case. *Dirksen*, 2018 WL 6293201, at *2-5; *Dhanoa*, 2018 WL 1221922, at *3-5. Both this petitioner and the petitioner in *Bruegging* suffered pain and limited ROM for a total of ten months. *Bruegging*, 2019 WL 2620957, at *1-4. However, the petitioner in *Bruegging* experienced pain at a level of eight to ten during the majority of this time. *Id.* at *1-3. On two occasions, she received a cortisone injection which offered little relief. *Id.* at *2-3.

During the fact hearing on June 26, 2018, the petitioner in this case gave credible testimony regarding her shoulder condition from vaccination to the present. She described an initial period of severe pain and limited ROM which gradually improved following 32 PT sessions at three different facilities.[30] Petitioner testified that she still experienced some pain, which was not significant enough to warrant surgery, and could perform most activities, requiring only an adjustment when lifting her iron skillet. Tr. at 26, 40. Petitioner has not required medical care for her SIRVA since shoulder injury since August 4, 2016, ten months after vaccination.

Looking at the totality of circumstances, including the severity of petitioner initial pain and suffering and limited ROM, the undersigned finds $80,000.00 to be an appropriate amount for petitioner's past pain and suffering.

### VIII. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **the undersigned finds that $80,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.[31] The undersigned also finds petitioner is entitled to the full amount sought, $2,564.78 to satisfy her Medicaid lien.**

Based on the record as a whole and arguments of the parties, **the undersigned awards compensation in the amount of $82,564.78 as follows:**

1. **A lump sum payment of $80,000.00 in the form of a check payable to petitioner, Deborah Kent; and**

2. **A lump sum payment of $2,564.78, representing compensation for full satisfaction of the Medicaid payments made on behalf of petitioner by Meridian Health Plan, a Medicaid Program for the State of Michigan, in**

---

[30] Petitioner attended seven PT sessions at Lakeshore Rehab from March 9 through 28, 2016. Exhibit 8 at 5-18 (in reverse order). After moving closer to Grand Rapids, she resumed PT at a new facility, Northern Physical Therapy Services ("Northern PT"), attending 16 PT sessions from April 14, through July 19, 2016. Exhibit 6 at 1. She also attended nine PT sessions from June 14 through August 4, 2016 at Spectrum Health Rehab. Exhibit 9 at 56.

[31] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

>    **the form of a check payable jointly to petitioner and Meridian Health Plan.  Petitioner agrees to endorse this check to Meridian Health Plan.**

The clerk of the court is directed to enter judgment in accordance with this decision.[32]

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master

---

[32] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.